

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK,

----------------------------------------------------------------------x

FINGER LAKES BOTTLING CO., INC.,
a New York corporation,

Petitioner,

–against –

COORS BREWING COMPANY,
a Colorado Corporation,

Respondent.

----------------------------------------------------------------------x

**PETITION TO CONFIRM
ARBITRATION AWARD
AND GRANT PETITIONER
PREJUDGMENT INTEREST**

Petitioner Finger Lakes Bottling Co., Inc, by its undersigned attorneys, petitions the Court

to confirm an arbitration award and grant petitioner prejudgment interest, alleging as follows:

### THE PARTIES AND JURISDICTION

1.      Petitioner Finger Lakes Bottling Co., Inc. ("Finger Lakes"), is a New York

corporation with its principal place of business located at 2181 Ellis Drive, Auburn, New York

13021.

2.      Upon information and belief, Respondent Coors Brewing Company ("Coors") is a

Colorado corporation with its principal place of business located in Jefferson County, Colorado.

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in

that the petitioner and respondent are citizens of different states and the amount in controversy

exceeds $75,000, exclusive of interests and costs.

4.      Venue is proper in this court pursuant to 9 U.S.C. § 9, in that the arbitration award

that is the subject of this petition was rendered in this district.

## BACKGROUND FACTS AND PETITION

5.     Finger Lakes is a second generation family owned beer wholesaler that operates in various counties in upstate New York. Beginning in 1993, Finger Lakes commenced distribution of Molson brand beer ("Molson") in the New York counties of Cayuga, Seneca, Ontario, Wayne, Oswego, and Yates County, pursuant to a distribution agreement with a predecessor in interest to Defendant Coors Brewing Company ("Coors").

6.     Subsequently, in 2003, Finger Lakes entered into an amended distribution agreement ("Distribution Agreement"). This agreement, which is annexed hereto as Exhibit A, contains an arbitration clause.

7.     This arbitration clause was held to be enforceable in an action commenced in the United States District Court for the Northern District of New York. *See Doldo Brothers, Inc. and Finger Lakes Bottling Co., Inc. v. Coors Brewing Company,* Slip Copy, 2008 WL 657252 (N.D.N.Y. 2008).

8.     On March 20, 2009, Coors' commenced an arbitration proceeding before the American Arbitration Association ("AAA") against Finger Lakes, AAA Case No. 13-155-00714-08 (the "Arbitration"). Coors' Demand for Arbitration is annexed hereto as Exhibit B. The Demand for Arbitration sought (a) a declaration that Coors' had the right to terminate the parties' distribution agreement; and (b) declaring the amount of compensation due to Finger Lakes' as a result of termination.

9.     However, just one day after Coors initiated the Arbitration, on March 21, 2008, Coors unilaterally terminated the parties Distribution Agreement and Finger Lakes' rights to distribute Molson.

10. At the same time of the termination, Coors' tendered a check from a third party, Wright Wisner Distributing Corp. ("Wright Wisner"), representing its one-sided calculation of the Molson brands' fair market value. At no time did Coors seek to reach agreement with Finger Lakes regarding the fair market value of Finger Lakes' distribution rights. Further, Finger Lakes' counsel requested that Finger Lakes be permitted to deposit the check with a full reservation of rights with respect to the issues in the Arbitration. Coors refused.

11. The AAA appointed Attorney Joanne Barak ("Arbitrator Barak") as the arbitrator in the Arbitration. On December 15 and 16, 2008, the parties and Arbitrator Barak conducted evidentiary hearings with testimony taken under oath. Subsequently, on February 25, 2009, Arbitrator Barak issued an arbitration award in favor of Finger Lakes and against Defendant Coors Brewing Company ("Coors") in the amount of $1,060,224.00 ("Arbitration Award"). The hearing was held and the Arbitration Award was rendered in the Southern District of New York. The Arbitration Award is annexed hereto as Exhibit C.

12. On March 31, 2009, Arbitrator Barak issued a Disposition of Application for Clarification of Award ("Clarification Ruling") (annexed hereto as Exhibit D). In her Clarification Ruling, Arbitrator Barak stated that the issue of prejudgment interest was "beyond the scope of the arbitration and was not considered," and therefore "Respondent's request to amend the Award to include interest from March 21, 2008, is denied without prejudice to seek interest in any enforcement proceeding."

13. On April 10, 2009, Wright Wisner (on behalf of Coors) tendered a check to Finger Lakes in the amount of $1,060,224.00. However, Coors' refused to permit Finger Lakes to deposit the check with a full reservation of rights to seek prejudgment interest. In particular, on April 17, 2009, Finger Lakes sent a letter to both Coors and Wright Wisner stating that "Finger

Lakes is not in a position to accept your purported settlement check tendered on behalf of Coors Brewing Company at the present time **unless** Coors Brewing Company stipulates that by depositing the check, Finger Lakes will not have waived its right to seek either pre and post-judgment interest or to recover the amount due to Finger Lakes by reason of the Arbitrators error in computation resulting from the Arbitrator's use of incorrect volume figures." The letter also stated that "If I do not hear from you [Wright Wisner] or Coors within 7 days, I will take your silence as a rejection and will proceed accordingly." Even to this day, Coors or Wright Wisner has refused to respond to Finger Lakes' request for a full reservation of rights. A copy of the April 17, 2009, letter is annexed hereto as Exhibit E.

14.    Finger Lakes hereby petitions this Court to confirm the $1,060,224.00 Arbitration Award as a valid and final arbitration award pursuant to 9 U.S.C. § 9, and grant Finger Lakes prejudgment interest pursuant to CPLR § 5001 in the amount of $116,261.40 (calculated as of July 1, 2009), for a total award of $1,176,485.40, plus interest until the judgment is paid.

WHEREFORE, Finger Lakes requests confirmation of the Arbitration Award based upon this Petition and exhibits attached hereto

Respectfully submitted,

ETTELMAN & HOCHHEISER P.C.

By: _____
Gary Ettelman, Esq. (GE 9315)
100 Quentin Roosevelt Blvd., Suite 401
Garden City, NY  11530
(516) 227-6300
Fax: (516) 227-6307

*Attorneys for Finger Lakes Bottling Co., Inc.*

# EXHIBIT A



# MOLSON DISTRIBUTORSHIP AGREEMENT

This Agreement between Molson USA, LLC ("Molson") and **Finger Lakes Bottling Co., Inc. of Auburn, New York** ("Distributor"), a S-Corporation organized under the laws of the State of New York, is made effective as of ___January 8___, 2002.

## 1. PURPOSE

1.1 This Agreement sets forth the respective obligations of Molson and Distributor regarding the sale by Molson to Distributor of only those Molson products (hereinafter "Products") listed on Exhibit A, "Product Portfolio and Market Area" and Distributor's resale of the Products to retailers. Molson may amend Exhibit A from time to time to add new products. The purpose of this Agreement is to support and promote the acceptance and popularity of the Products with consumers resulting in the success of Distributor and Molson.

1.2 Distributor and Molson agree that this Agreement includes by reference the terms of the Molson Distributor Standards Manual (the "Standards Manual"), as amended from time to time, but no more frequently than annually, by Molson, and the terms of the letter confirming the appointment of Distributor (the "Appointment Letter"). The implementation, performance and enforcement of the terms of this Agreement and the Standards Manual shall be subject to the duty of good faith and fair dealing.

1.3 Molson has retained Coors Brewing Company ("Coors") to facilitate the sales and distribution of Products under this Agreement.

## 2. APPOINTMENT

2.1 Molson hereby appoints Distributor as its sole wholesale distributor of, and grants Distributor the right to sell the Products only in the Market Area (hereinafter "Market Area") described in Exhibit A. The purpose of designating the Market Area is to establish geographic boundaries within which Distributor is accountable for quality control of Products and within which Molson can evaluate Distributor's performance of its obligations under this Agreement. Except as indicated below, Molson will not grant to any other distributor the right to sell the Products in the Market Area.

2.2 Distributor shall not sell, deliver or transfer any Product to any retail account outside the Market Area or to any person Distributor knows or has reason to believe will sell or transfer any of the Products outside the Market Area. Notwithstanding the foregoing and where permitted by law,

EXHIBIT A

Market Area. Notwithstanding the foregoing and where permitted by law, Distributor may, with the prior written approval of Molson, sell one or more Products outside the Market Area to the extent and so long as Molson shall authorize. Nothing herein shall prohibit Distributor from selling Products to, or purchasing Products from, another Molson distributor for the purposes of eliminating product shortages or inventory imbalances. Distributor shall not supply Products to any retail account that sells, delivers or transfers Products to other retail accounts without Molson's prior written approval and compliance with such conditions as Molson shall require.

2.3    If the exclusive rights granted in section 2.1 are or shall become prohibited under federal law or the laws of the state in which the Market Area is located, then such provision shall not apply. In that event, Molson appoints Distributor as a non-exclusive distributor of, and grants Distributor the right to sell the Products in, the Market Area, which shall be Distributor's primary area of responsibility for sale of the Products. In the event applicable law shall require appointment of Distributor pursuant to this provision, Distributor shall provide to Molson all information required by the Standards Manual for sales outside of Distributor's Market Area.

2.4    Distributor hereby accepts such appointment. Distributor acknowledges that it has paid no consideration to Molson in exchange for this appointment.

2.5    Notwithstanding the provisions of section 2.1, if applicable, Molson may, after giving notice to Distributor, permit another person or persons to sell, or Molson may sell one or more Products within the Market Area to the extent and so long as Distributor is unable or unwilling to provide uninterrupted service to accounts within all or any part of the Market Area, provided, where required, permission to do so is obtained from the appropriate state regulatory authorities.

2.6    Unless specifically permitted by applicable state law, Distributor shall not appoint sub-distributors for Products. In the event of any such permitted appointment, Distributor shall nonetheless retain responsibility for all sales execution and quality assurance commitments as set forth in this Agreement and shall indemnify Molson and Coors for claims arising out of the sub-distribution relationship and the actions of all such sub-distributors.

## 3. TERM

3.1    This Agreement shall continue in effect from the effective date hereof until terminated or amended pursuant to the terms hereof.

3.2    Due to the advisability of changes being made in this Agreement from time to time, this Agreement may be amended, as follows:



3.2.1    Concurrently with the submission of a proposed amendment of this Agreement to the Distributor, Molson will submit to all other Molson distributors in the United States that have signed a distributorship agreement in substantially similar form, an amendment identical to the amendment submitted to the Distributor, except for any change necessary in Molson's opinion to comply with the requirements of state law and the provisions contained in any distributor's Appointment Letter.

3.2.2    Distributor shall indicate its acceptance of all of the terms of the proposed amendment by signing and returning to Molson four (4) copies of the executed amendment. If four (4) copies of the executed amendment shall not have been received by Molson within 90 days after receipt by the Distributor, this Agreement shall automatically terminate and both Molson and the Distributor shall have no further right or obligation hereunder, except under those terms which explicitly survive the termination hereof.

## 4.  DUTIES OF DISTRIBUTOR

Distributor shall actively and aggressively solicit business from every licensed retail account in the Market Area in order to accomplish the purposes of this Agreement and to achieve and maintain the highest practicable distribution of the Products in the Market Area. In particular, Distributor shall:

4.1    Diligently perform quality control practices and procedures throughout the Market Area, in accordance with the Standards Manual.

4.2    Achieve such reasonable performance goals as Molson, with input from Distributor, may establish for Distributor from time to time and communicate in writing to Distributor.

4.3    Maintain wholesale inventories at levels recommended by Molson.

4.4    Maintain sufficient working capital to operate Distributor's business so as to comply with Distributor's obligations under this Agreement.

4.5    Know and adhere to all local, state and federal laws and regulations applicable to Distributor's business. Distributor shall promptly report to Molson any notice of change, suspension or expiration of any permit or license required by any federal, state or municipal agency.

4.6    Provide accurate and timely Product forecasts in accordance with the terms of the Standards Manual.

4.7    Actively promote and market all Molson recommended packages of each Product by following such standards for Product distribution and execution

as Molson may from time to time provide, as found in the Standards Manual, and by cooperating in Molson's distributor sales and marketing promotions.

4.8     Provide adequate warehouse area to receive, ship and store Products handled by Distributor, according to the standards set forth in the Standards Manual; and implement and maintain delivery procedures to minimize temperature increases of the Products.

4.9     Provide uninterrupted sales and services to all retail accounts in the Market Area except as precluded by acts of God, war or conditions of national, state or local emergencies. Distributor shall diligently attempt to prevent any service interruption and to restore service as quickly as practicable after any interruption.

4.10    Furnish to Molson, as Molson may from time to time request during the term of this Agreement, by a date specified by Molson reasonably in advance, a detailed business/marketing plan, in the form and covering the matters directed by Molson.

4.11    Maintain adequate information and records of sales and service calls and deliveries; maintain sales and inventory reports; and maintain such other books and records as requested by Molson for purposes of internal operational control. Maintain and submit to Molson such marketing and sales data, organizational and other operational records and reports as may be requested by Molson from time to time.

4.12    Maintain and submit to Molson at least annually, no later than 120 days after the end of Distributor's fiscal year, and more frequently as requested by Molson, complete and accurate financial statements, including a balance sheet as of the end of such year or other period and related statements of income and cash flows for the year or other such period then ended. Such statements shall be compiled, reviewed or audited by a certified public accountant, shall be signed by an officer of Distributor, which signature shall constitute a representation that to the best of the officer's knowledge and belief, the statements fairly and accurately reflect the financial condition of Distributor's business as of the end of the fiscal year or other period and the results of its operations for the year or other period then ended; and to the extent practicable, shall be prepared in accordance with generally accepted accounting principles. If such financial statements are not signed by an officer of Distributor, delivery of the statements to Molson shall constitute Distributor's representation that the financial statements conform to these standards. Upon request, Distributor shall provide Molson with accurate financial statements in similar form and with the same representations for any parent entity owning an 80% or more interest in Distributor. Distributor recognizes that provision of such information is based upon Molson's continuing interest

in the financial soundness and viability of Distributor's business. Except when requested by Distributor, Molson shall maintain in confidence all financial information submitted by Distributor under this section, provided that Molson may use such information internally and with its consultants, provided said consultants similarly agree to maintain the information in confidence. Molson may also use such information in preparing composite financial information for groups of distributors and such information may be disclosed to other distributors, provided the identity of any distributor whose financial information is a part of the composite shall not be disclosed and is not ascertainable from the composite information. All financial information submitted by Distributor under this section shall be maintained in the Coors "Credit Department," in Golden, Colorado. All requests to review such information shall be presented for approval by the Coors "Wholesaler Network Department." Any such information released to a Coors "Field Business Area" ("FBA") office shall be given only to the Coors Area Vice President ("AVP") or other Coors FBA employees at the "Director" level or above.

4.13   Permit Molson and Coors representatives to inspect all aspects of Distributor's operations relating to the Products, including all books and sales records at such times as Molson or Coors may reasonably request. Distributor shall respond promptly and in good faith to all requests by Molson or Coors for the information required under sections 4.11 and 4.12 and such additional information as shall be reasonably requested by Molson or Coors.

## 5.   REPRESENTATIONS AND WARRANTIES OF DISTRIBUTOR

5.1   The representations and warranties made by Distributor in connection with its application for the distributorship rights granted hereunder are material inducements upon which Molson has relied in selecting Distributor for the appointment made pursuant to this Agreement. Distributor hereby represents and warrants that all information contained in its application and in the Appointment Letter are true, complete and accurate. Distributor shall promptly notify Molson in writing of any material change in such information.

5.2   Molson shall continually rely upon the information referred to in section 5.1 and upon the financial, sales, statistical and other information previously and hereafter provided by Distributor to Molson hereunder. Distributor warrants the continuing accuracy and completeness of all such information.

5.3   Distributor represents that it has all federal, state and municipal permits and licenses necessary to distribute the Products in the Market Area as contemplated hereby.

6. <u>TERMS OF SALE</u>

6.1   Distributor shall have the sole and exclusive right to establish the price for resale of the Products.

6.2   All sales of Products by Molson to Distributor shall be at such prices and on such cash or credit terms as Molson shall establish from time to time. Molson may, from time to time, in its sole discretion, change prices and terms and conditions of sales, delivery and payment.

6.3   Molson reserves the right to modify or discontinue the sale of any Product, package or container on a national, regional, state or other basis.

6.4   Molson shall have the right to place the Distributor on allocation when the supply of any Product is for any reason insufficient to meet the demands of all distributors. Molson shall not be liable to Distributor for failure to make any delivery to Distributor or delay in any delivery if caused by lack of supply or by any circumstances beyond the reasonable control of Molson.

6.5   Products sold to Distributor hereunder shall be shipped from and to the locations designated by Molson or Coors from time to time, and Molson may at any time change the designated source brewery.

7. <u>CHANGES IN MANAGEMENT</u>

7.1   The parties acknowledge that this is a personal services contract entered into in reliance upon and in consideration of the personal qualifications of the "Principal Manager," "Operating Manager," or any "Manager" identified in Distributor's Appointment Letter. If any person so identified as a Principal Manager, Operating Manager or any other Manager in Distributor's Appointment Letter, or any other person hereafter approved as a successor to such person, ceases to serve in that capacity or to devote full time to that function, Distributor shall give immediate written notice to Molson's field sales office.

7.2   Molson may, in its discretion, disapprove any proposed successor Principal Manager, Operating Manager, or Manager if, in its reasonable judgment, the proposed successor does not meet the management standards established and published by Molson from time to time. Any failure by Molson to disapprove a proposed successor Manager shall not be construed as Molson's determination with respect to the qualifications of such successor. Distributor and Molson shall cooperate to identify a person meeting the management standards and accomplishing the purposes of this Agreement.



## 8. CHANGES IN CONTROL AND OWNERSHIP OF DISTRIBUTOR

8.1    If Distributor is a corporation, limited liability company ("LLC"), partnership or other entity, Molson's written approval shall be obtained prior to (A) any change in the record or beneficial ownership of 10 percent or more of Distributor's outstanding stock, membership interests, partnership interests or other ownership or equity interests, determined on a cumulative basis from the effective date of the last approved ownership change of this Agreement; (B) any change in such ownership that results in a change in majority control of Distributor; (C) any change in any of Distributor's principal officers, directors or managing partners (or managers if Distributor is an LLC); or (D) any resignation, removal or admission of any additional or substitute general partner of Distributor or of any general partner of a Distributor partnership.

8.2    Distributor shall not, without the prior written approval of Molson, assign, pledge, hypothecate or otherwise encumber this Agreement or any rights hereunder. Distributor shall not cause or permit the assignment, pledge, encumbrance or hypothecation of any ownership interest in Distributor, whether in the form of stock, membership interests or otherwise. In the event Distributor shall assign, pledge or hypothecate this Agreement or the rights hereunder without Molson's consent, such assignment shall be void.

8.3    Distributor shall not, without the prior written approval of Molson, change the form of business entity or permit the occurrence of any merger, consolidation or event or series of events that have the effect of transferring the ownership, control or management of Distributor.

8.4    Distributor may, without Molson's consent, acquire the rights to sell other brands of beer or other beverages in the Market Area or elsewhere, provided the transaction by which such brands are acquired does not involve a transaction requiring Molson's consent or review under sections 8.1, 8.2, 8.3 or 8.5. The acquisition of such other brands shall not reduce Distributor's obligations to Molson.

   8.4.1    At least 30 days prior to the closing of an acquisition relating to other brands or products, which acquired brands or products are likely to result in Distributor revenues greater than 25% of Distributor's prior year total revenues from the sale of beer or other beverages, Distributor shall provide the applicable Molson or Coors AVP with information and assurances for performance in efforts, resources and manpower such that there will be no dilution of effort as to the Products.

   8.4.2    In the event that Distributor is a party to any transaction the result of which will be to decrease Distributor's anticipated annual revenues from the sale of malt beverage products by

25% or more, Molson shall have the right, upon 30 days' written notice, to elect to purchase, either directly or through an assignee, the brand rights to the Products at a fair market price (determined under paragraph 8.4.2.1) and terminate this Agreement upon the closing of such purchase.

8.4.2.1    The fair market purchase price for a transaction under paragraph 8.4.2 shall be determined by agreement between Molson and Distributor. Failing agreement by Molson and Distributor, the fair market value shall be determined by a single independent appraiser appointed, as follows: Within 30 days after the election by Molson, Distributor and Molson shall each appoint an independent appraiser knowledgeable as to the valuation of such property and within 15 days thereafter those two persons shall select the independent appraiser. The independent appraiser shall promptly determine the fair market value of the proposed transaction. The parties shall thereafter proceed to close the transaction for the Molson brands. The costs and expenses of the three appraisers shall be shared equally by Distributor and Molson.

8.4.2.2    Upon the 8.4.2 payment by Molson, the Distributor shall execute a full release of all claims, of whatever nature, Distributor may have against Molson and Coors. Distributor shall also execute such documents as may be reasonably necessary to accomplish the transfer of the brands to Molson or its assignee.

8.5    The sale, transfer or disposition of any portion of Distributor's business that includes the purchase and sale of Products (the "Sale Transaction"), whether in the form of sale of assets, stock, membership interests or partnership interests, merger or otherwise, including transfers by operation of law, except as provided in section 8.8, shall be subject to Molson's prior approval of the prospective purchaser or successor as provided in sections 8.6 and 8.7 and to the terms of this section 8.5.

8.5.1    If Distributor desires to pursue a Sale Transaction regardless of the form of such proposed transaction, Distributor shall meet with Molson to discuss Distributor's plans and shall give Molson written notice (a "Sale Notice") of Distributor's intent to effect a Sale Transaction prior to conducting discussions with any third party, including another of Distributor's suppliers. If Distributor

receives an unsolicited offer for a Sale Transaction, no meeting with or notice to Molson shall be required unless and until Distributor has the intent to sell the business. Molson shall not be obligated to review any request for approval of a Sale Transaction under section 8.6 until Distributor meets with Molson to discuss such matter and gives Molson a Sale Notice.

8.6     Prior to effecting any Sale Transaction, subject to the other provisions of this Article 8, Distributor will submit to Molson a copy of the proposed agreement for transfer and shall cause the prospective purchaser to submit to Molson a completed distributorship application and such other forms and information as may be requested by Molson. Molson shall review the application in light of the then current market conditions in the Market Area. Completion of the Sale Transaction shall be effected only after: Molson has approved, in writing to Distributor, the prospective purchaser and the terms of the Sale Transaction; the prospective purchaser has agreed in writing to assume all of the terms and conditions of this Agreement; all accounts between Distributor and Molson have been settled, or adequate security has been posted by Distributor or Molson, as the case may be, to secure any account that is disputed; and a complete and absolute mutual release between Distributor, Molson and Coors, covering all matters other than product liability, shall have been executed and delivered by each party to the other in a form satisfactory to Distributor and Molson.

8.7     Molson has the right to do business with persons of its own choosing and shall have complete discretion to approve any prospective purchaser of Distributor's business. From time to time, Molson will promulgate guidelines regarding the criteria for evaluation of distributor candidates.

8.8     Notwithstanding any provision of this Article 8, no approval by Molson shall be required for any transfer of ownership in the distributorship upon the death or incompetence of the Distributor or its principal owner to or for the benefit of a member of Distributor's or such principal owner's immediate family. For the purposes of this provision, immediate family shall be limited to parent, spouse, sibling, adult child and adopted adult child. The provisions of Article 7 shall apply to any change in Manager regardless of the application of this section 8.8.

## 9. TRADEMARKS

9.1     Distributor acknowledges that the trademarks, trade names, service marks and other trade designations Molson uses in connection with all Products and other products sold or licensed to be sold by Molson are and shall remain the sole and exclusive property of Molson. Molson reserves all rights with respect thereto, including without limitation the right to license the use of its trademarks and trade names, designs, brand names, labels,

promotional slogans and service marks on merchandise, goods, items and services.

9.2  Molson hereby grants Distributor, for the term of this Agreement only, a limited, non-assignable and non-transferable right to use those Molson's trademarks and trade names associated with the Products in distributing, advertising and promoting the sale of the Products. All such usage shall be in accordance with the policies set forth in the Distributor Standard on Trademark Licensing contained in the Standards Manual.

## 10. TERMINATION OF AGREEMENT

10.1  This Agreement may be terminated at any time by mutual agreement of the parties or by Distributor upon 90 days' prior written notice to Molson.

10.2  Upon the occurrence of any of the following events, Molson may, by giving written notice to Distributor, immediately terminate this Agreement, without obligation to comply with the provisions of section 10.3 and without paying any amount to Distributor except with respect to the repurchase of Distributor's inventory pursuant to section 10.5.

    10.2.1  Revocation or non-renewal of Distributor's federal, state or local license or permit to sell or distribute beer.

    10.2.2  Suspension for a period of 14 calendar days of the Distributor's federal, state or local license or permit to sell or distribute beer.

    10.2.3  The inability of Distributor to pay its debts as they mature; or Distributor's liabilities exceed the fair market value of its assets; or the filing by Distributor of a voluntary petition seeking relief under any provision of any bankruptcy or other law for the relief of debtors; or the filing of a petition seeking to have distributor declared bankrupt or seeking any reorganization or re-capitalization of distributor, unless such petition shall have been vacated within 30 days from the filing thereof prior to the effective date of the termination of this Agreement; or the appointment of a receiver or trustee for a substantial portion of the property or assets of Distributor, unless such appointment shall have been vacated within 30 days from the date thereof and prior to the effective date of the termination of this Agreement; or the execution by Distributor of an assignment for the benefit of creditors; or the dissolution or liquidation of Distributor.

    10.2.4  Conviction of Distributor, any owner of Distributor or any Manager of a felony or other crime that, in Molson's reasonable judgment, may adversely affect the goodwill of Distributor or Molson.

10.2.5    Fraudulent conduct or misrepresentation on the part of Distributor, any owner of Distributor, any Manager or any supervisory employee of Distributor in dealing with Molson or the Products.

10.2.6    Distributor's failure to pay Molson or Coors for Products purchased from Molson, when such payment is due under the terms and conditions of sale established by Molson from time to time.

10.2.7    Intentional conduct by the managers or employees of Distributor in permitting the Sale of Products outside the quality standards set forth in the Standards Manual.

10.2.8    Completion of any transaction requiring Molson's prior approval under Article 8 without obtaining such approval.

10.2.9    The cessation of the Distributor's business for five consecutive days, unless such cessation is the result of acts of God, war or conditions of national, state or local emergencies.

10.3    The following shall be considered "Deficiencies":

10.3.1    Failure by Distributor to comply with any of the requirements of the Standards Manual;

10.3.2    The failure of any representation or warranty under Article 5 hereof;

10.3.3    Failure by Distributor to comply with any of the commitments of the Appointment Letter;

10.3.4    Failure by Distributor to achieve reasonable performance requirements established pursuant to sections 4.1 and 4.2 of this Agreement and the procedures set forth in the Standards Manual;

10.3.5    Failure by Distributor to make timely payment of any other obligation owing to Molson;

10.3.6    Conduct unbecoming a reputable business person, which, in the reasonable opinion of Molson, may adversely affect the reputation of Molson or the reputation of the Products;

10.3.7    Failure by Distributor to perform any of the other obligations, duties or responsibilities under this Agreement.

10.4    Molson may, at any time, give Distributor written notice of a Deficiency.

10.4.1    If the Deficiency is the Distributor's failure to achieve any sales performance requirement established by Molson pursuant to section 4.2 and the system set forth in the Standards Manual, then within 30 days of the Distributor's receipt of notice thereof, a representative of Molson shall communicate with the Distributor Manager(s) to discuss a process by which such sales performance deficiency will be cured.   Molson shall provide assistance to the Distributor in formulating a plan and timetable for corrective action, including participation by representatives of Molson in the performance improvement plan described in the Standards Manual.  No later than 60 days after the initial discussions with Molson following the notice of sales performance deficiency, the Distributor shall provide to Molson a completed plan, in form reasonably acceptable to Molson, describing the process and timetable for corrective action.  Thereafter, for the duration of the time period of the cure process, Molson shall provide special assistance to the Distributor pursuant to the performance improvement plan described in the Standards Manual.

10.4.2    If the Deficiency relates to other than sales performance, Molson shall specify the reasons for such notice, the items to be corrected and the time period within which each Deficiency must be corrected.  To the extent that such Deficiency cannot reasonably be corrected within 30 days of the receipt of Molson's written notice of Deficiency, Distributor shall have a period of 30 days from such notice to submit a detailed plan and timetable of corrective action for Molson's review.  Molson and Distributor shall agree upon a reasonable timetable to correct to Molson's satisfaction each Deficiency set forth in Distributor's plan of corrective action, but in no event shall such period exceed 120 days from Molson's notice of Deficiency. Distributor shall not be permitted to cure any Deficiency which has been the subject of a previous notice of deficiency and cure on two or more prior occasions within the 24-month period prior to the subject deficiency.

10.4.3    If Distributor fails to cure any Deficiency set forth in the notice from Molson under either section 10.4.1 or section 10.4.2 to Molson's reasonable satisfaction within the appropriate period provided in section 10.4.1 or section 10.4.2 or if the subject deficiency has been the subject of a previous notice of deficiency and cure on two or more prior occasions within the prior 24-month period, Molson may, by giving written notice to Distributor, immediately terminate this Agreement.  In lieu of termination and notwithstanding the provisions of section 2.1, Molson may elect to alter Exhibit B so as to reduce Distributor's

Market Area and/or alter Exhibit A so as to remove one or more of the Products that the Distributor may buy and resell under this Agreement.

10.5    Promptly upon expiration or termination of this Agreement for any reason, Distributor will sell and deliver to Molson, or as directed by Molson, at Distributor's laid-in costs, Distributor's inventory of Products complying with Molson's quality standards as of the date of termination. "Laid-in costs" shall mean the delivered purchase price paid by Distributor to Molson for such Products, plus deposits, plus the amount of any state and local taxes paid by Distributor in connection with the purchase of such Products. Distributor shall separate all inventory not complying with Molson's quality standards ("Noncomplying Inventory") and follow Molson's instructions for disposition of such Products. Payment by Molson shall be conditioned on Distributor's compliance with the terms of this paragraph. All of Distributor's Noncomplying Inventory shall be destroyed by Distributor. All Products in the retail market more than 14 days "out of code" shall also be destroyed and replaced by Distributor from Distributor's remaining inventory or shall be repurchased from the affected retailer by Distributor and destroyed, all at Distributor's cost. If Distributor fails to locate and destroy such Products in the retail market, Molson, at its option, may do so and reduce the amount paid for Distributor's inventory by the reasonable cost of such actions. Distributor shall immediately surrender and deliver to Molson, or as directed by Molson, all barrels, pallets, bottles, cases and supplies acquired by Distributor from Molson, and Molson shall promptly refund Distributor's deposits for such items to Distributor. Distributor shall immediately surrender and deliver to Molson, or as directed by Molson, all of Molson's signs and advertising displays in Distributor's possession, and Molson shall reimburse Distributor's actual costs, plus cost of delivery as directed by Molson. Distributor and Molson shall, as promptly as practicable, adjust all outstanding accounts, and Distributor or Molson, as the case may be, shall immediately pay to the other any remaining balances due. Upon termination, all unfilled orders placed by Distributor shall be deemed canceled.

## 11. RESOLUTION OF DISPUTES

11.1    Except as set forth below, if any dispute between Distributor and Molson shall occur, including without limitation a dispute as to whether Molson has grounds to terminate this Agreement, such dispute shall be submitted by Distributor for informal mediation ("Mediation") of the dispute by the chief officer of Molson (or his designee) within 60 days of the date the dispute shall first arise. Molson, but not Distributor, shall be bound by the decision of the chief officer of Molson (or his designee) concerning the dispute. Mediation shall be a condition precedent to Distributor's right to pursue any other remedy available under this Agreement or otherwise



available under law. Molson shall not be required to mediate any claim against Distributor for nonpayment of Distributor's outstanding account.

11.2   Any and all disputes between Distributor and Molson or Coors, except nonpayment of Distributor's account, including without limitation a dispute as to whether Molson has grounds to terminate this Agreement, which disputes are not resolved by Mediation, shall be submitted to binding arbitration in the city nearest to Distributor in which there is a regional office of the American Arbitration Association, before a single arbitrator, in accordance with the Commercial Arbitration Rules and procedures of the American Arbitration Association. Any and all disputes shall be submitted to arbitration hereunder within one year from the date the dispute first arose or shall be forever barred. Arbitration hereunder shall be in lieu of all other remedies and procedures, provided that either party hereto may seek preliminary injunctive relief prior to the commencement of such Arbitration proceedings.

## 12. MISCELLANEOUS PROVISIONS

12.1   The provisions of this Agreement are subject to and shall be governed by the laws of the State and other subordinate jurisdictions in which Distributor's principal place of business is located. The laws, rules and regulations of such jurisdiction are hereby incorporated in this Agreement and made a part hereof to the extent that such laws, rules and regulations are required to be so incorporated and, to such extent, shall supersede any conflicting provision of this Agreement, including, but not limited to, the requirement for or length of any notice period.

12.2   The illegality or unenforceability of any provision of this Agreement will not impair the legality or enforceability of any other provision of this Agreement.

12.3   Failure by Molson or Distributor to enforce any term or provision in this Agreement in any specific instance shall not constitute a waiver by such party of any such term or provision, and Molson and Distributor may enforce such term or provision in any subsequent instance without limitation or penalty.

12.4   Unless otherwise indicated herein, any notice provided for herein may be served by personal service upon either party or by facsimile, followed by certified mail. Notice to Molson, shall be sent to the attention of its chief officer, with a copy to Coors to the attention of its Senior Vice President of Sales or, should there be a title change, the senior sales executive. Notice to Distributor shall be sent to its Principal Manager or Operating Manager, at such address as provided to Molson by Distributor's as its corporate address of record.




12.5   Except as stated herein, this Agreement may be amended only by a writing executed by both parties, except that Molson may unilaterally amend this Agreement at any time if such amendment does not materially and adversely affect Distributor and is effective as to all distributors in its distributor network bound by an agreement similar to this Agreement.

12.6   This Agreement, the Standards Manual, and the Appointment Letter contain the entire agreement of the parties with respect to the subject matter hereof; there are no other representations, inducements, promises or agreements, oral or otherwise, between the parties. In the event of an inconsistency between this Agreement and any document incorporated herein, the terms of this Agreement shall control.

12.7   Nothing herein shall be construed to make Distributor the joint venturer, partner, agent, servant or employee of Molson, and Distributor shall not have the power to bind or obligate Molson except as specifically set forth in this Agreement.

This Agreement is executed by Distributor on the  8  day of  January 2003  2002, effective as of  1/8/2003 , 2002

Finger Lakes Bottling Co., Inc.

By  _Tony Vasile_
Samuel J. Vasile

Molson USA, LLC
Attn: Coors Brewing Company
311 10th Street – NH309
Golden, CO 80401

By:  _____
Dave Perkins
President, Molson USA, LLC

330100

# EXHIBIT B

 

# EXHIBIT A

## PRODUCT PORTFOLIO and MARKET AREA

Auburn, NY

According to our records, the following constitutes Distributor's authorized Products and Market Area.

### MARKET AREA

In the State of New York:

All of the Counties of Cayuga, Ontario, Oswego, Seneca and Wayne.

The entire County of Yates, except the Town of Dundee south of Shannon Corners Road and east of Pre Emption Road.

### BRANDS

Molson Canadian
Molson Canadian Light
Molson Exel
Molson Export Ale
Molson Golden
Molson Ice
Molson XXX
Old Vienna

Unless specifically included, the Market Area set forth above excludes Ship Chandler/Duty Free distribution.

Reviewed and Accepted this  17  day of  Feb. , 2004.

**Finger Lakes Bottling Co., Inc.**

By: _Samuel J. Vasile_  Pres

Samuel J. Vasile, President

330100                                                                                                11-Feb-04



**FOLEY**

FOLEY & LARDNER LLP

ATTORNEYS AT LAW

777 EAST WISCONSIN AVENUE
MILWAUKEE, WI 53202-5306
414.271.2400 TEL
414.297.4900 FAX
www.foley.com

WRITER'S DIRECT LINE
414.297.5557
jchristiansen@foley.com EMAIL

CLIENT/MATTER NUMBER
065765-0154

March 20, 2008

<span style="font-variant: small-caps">Via Federal Express</span>

Ms. Catherine Shanks
Vice President, Case Mgmt. Center
American Arbitration Association
950 Warren Avenue
East Providence, RI 02914

> Re:    **Coors Brewing Company v. Finger Lakes Bottling Co., Inc.**
>        **Demand for Arbitration**

Dear Ms. Shanks:

Enclosed please find two copies of an Arbitration Demand filed by Coors Brewing Company against Finger Lakes Bottling Co., Inc., Respondent. The claim is a non-monetary claim for declaration, therefore I enclose a check in the amount of $3,250.00 in payment of the administrative filing fee assessed by the AAA.

A copy of the arbitration demand is being sent electronically to Gary Ettelman, counsel for Respondent, who has agreed to accept service.

In accordance with the AAA rules, please provide the parties with arbitrator lists from which to select an arbitration at your earliest convenience.

Yours very truly,

Jon Christiansen

Enclosures

cc:    Gary Ettelman (via e-mail, w/enclosures)
       William H. Beyer (via e-mail, w/enclosures)

BOSTON          LOS ANGELES       SACRAMENTO          TALLAHASSEE        MILW_4924378.1
BRUSSELS        MADISON           SAN DIEGO           TAMPA
CHICAGO         MILWAUKEE         SAN DIEGO/DEL MAR    TOKYO
DETROIT         NEW YORK          SAN FRANCISCO       WASHINGTON, D.C.
JACKSONVILLE    ORLANDO           SILICON VALLEY

 American Arbitration Association
*Dispute Resolution Services Worldwide*

## COMMERCIAL ARBITRATION RULES
### DEMAND FOR ARBITRATION

| | |
|---|---|
| *MEDIATION: If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.* ☐ *There is no additional administrative fee for this service.* | |

| | |
|---|---|
| Name of Respondent<br>Finger Lakes Bottling Co., Inc. | Name of Representative (if known) |
| Address<br>2181 Ellis Drive | Name of Firm (if applicable) |
| PO Box 694 | Representative's Address |

| City<br>Auburn | State<br>NY | Zip Code<br>13021- | City | State | Zip Code |
|---|---|---|---|---|---|
| Phone No.<br>315.253.6561 | | Fax No.<br>315.253.6551 | Phone No. | | Fax No. |
| Email Address: | | | Email Address: | | |

The named claimant, a party to an arbitration agreement dated January 8, 2003_____, which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

THE NATURE OF THE DISPUTE
See Exhibit A attached.

| | |
|---|---|
| Dollar Amount of Claim  $0.00 | Other Relief Sought:  ☒ Attorneys Fees    ☐ Interest<br>☒ Arbitration Costs ☐ Punitive/ Exemplary ☒ Other See Ex. A |

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee) $3,250.00

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
At least 10 years commercial trial or judicial experience, with antitrust experience preferred.

Hearing locale New York, NY_____    (check one) ☐ Requested by Claimant   ☒ Locale provision included in the contract

| | |
|---|---|
| Estimated time needed for hearings overall:<br><br>_____ hours or ____4____ days | Type of Business:  Claimant ___Brewer___<br><br>Respondent Distributor |

Is this a dispute between a business and a consumer? ☐Yes ☒ No Does this dispute arise out of an employment relationship? ☐ Yes ☒ No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required by California law. ☐Less than $100,000 ☐ $100,000 - $250,000 ☐ Over $250,000

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one)  ☐ Atlanta, GA  ☐ Dallas, TX    ☒ East Providence, RI ☐ Fresno, CA   ☐ International Centre, NY, with a request that it commence administration of the arbitration.  Under the rules, you may file an answering statement within fifteen days after notice from the AAA.

| Signature (may be signed by a representative)  Date:<br>3/20/08 | Name of Representative<br>Jon P. Christiansen | Michael Lockerby |
|---|---|---|
| Name of Claimant<br>Coors Brewing Company, c/o William H. Beyer | Name of Firm (if applicable)<br>Foley & Lardner LLP | Foley & Lardner LLP |
| Address (to be used in connection with this case)<br>PO Box 4030 NH335 | Representative's Address<br>777 E. Wisconsin Ave. | 300 K Street NW |

| City<br>Golden | State<br>CO | Zip Code<br>80401- | City<br>Milwaukee, WI 53202 | | Washington, DC 20007 |
|---|---|---|---|---|---|
| Phone No.<br>303.277.7001 | | Fax No. | Phone No.    Fax No.<br>414.297.5557 /414.297.4900 | | Phone/Fax no:<br>202.945.6097/202.672.5399 |
| bill.beyer@coors.com | | | Email Address:<br>jchristiansen@foley.com | | mlockerby@foley.com |

To begin proceedings, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the AAA. Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online.  AAA Customer Service can be reached at 800-778-7879

EXHIBIT A TO ARBITRATION DEMAND

*In the Matter of the Arbitration Between*

---

Coors Brewing Company, Claimant

v.

Finger Lakes Bottling Co., Inc., Respondent

---

1.      Coors Brewing Company ("Coors"), a Colorado corporation, is a brewer and seller of beer products.

2.      Finger Lakes Bottling Co., Inc. ("Finger Lakes"), a New York corporation, is a distributor of various beverages, including Molson beers.

3.      Molson USA LLC ("Molson USA") is a Delaware limited liability company formed in 2000 by Coors and a subsidiary of Molson Canada to take over the United States distribution of Molson products from a joint venture between Molson Canada and Miller Brewing Company.

4.      Molson USA and Finger Lakes entered into a distributor agreement for the purchase and sale of Molson products in certain counties of New York (the "Distributor Agreement"). The agreement was effective as of January 8, 2003. The Distributor Agreement contains a provision requiring that all disputes between the parties be submitted to arbitration. A copy of the Distributor Agreement is attached hereto as Exhibit A.

5.      On December 2, 2007, the Distributor Agreement was assigned by Molson USA to Coors in connection with a transaction by which most of the assets of Molson USA were transferred to Coors.

6.      In 2001, Molson USA adopted a plan of national consolidation (the "Consolidation Plan") that was and is reasonable essential and non-discriminatory. The purpose of the plan was and is to have Molson products distributed by Coors distributors and to have fewer and more financially secure distributors. At the beginning of 2001 there were over 500 Molson distributors in the United States; more than 65% of these distributors were not Coors distributors. After adopting the Consolidation Plan, Molson USA sought to persuade Molson distributors that were not aligned with Coors to sell their Molson distribution rights to the local Coors distributor. By the end of 2003, more than 80% of the distributors of Molson products were also Coors distributors.

7.    On March 11, 2005, Molson USA gave notice to all New York Molson distributors that were not also Coors distributors (the "unaligned distributors") of Molson USA's intent to pursue the Consolidation Plan in New York, though involuntary terminations if necessary.

8.    In furtherance of the Consolidation Plan, Molson USA commenced a test arbitration case against an unaligned New York distributor, John G. Ryan, Inc ("Ryan"). In the Ryan case, Molson USA asserted that under section 55-c of the New York Alcoholic Beverage Act (the "Act"), Molson USA had good cause to terminate Ryan because of the Consolidation Plan. In the arbitration, Molson USA sought a declaration of the amount of compensation due to Ryan because of the termination.

9.    Molson USA gave notice of the test case to Finger Lakes and the other unaligned Molson distributors. Molson USA represented to the unaligned distributors that if Molson USA were successful in the test case against Ryan, Molson USA would pursue termination of the other unaligned New York Molson distributors.

10.    Resolution of the Ryan case was delayed because Ryan challenged Molson USA's right to arbitration by commencing an action in New York state court to enjoin the arbitration from proceeding. After removing the case to federal court, Molson USA was successful in obtaining an order compelling Ryan to arbitrate. See *John G. Ryan, Inc. v. Molson USA LLC*, 2005 WL 2977767 (E.D.N.Y. November 7, 2005).

11.    Thereafter, the arbitrator in the Ryan case issued two awards in Molson USA's favor, finding: (1) that Molson USA's Consolidation Plan satisfied the requirements of the Act as a national plan of consolidation; and (2) that the compensation due to Ryan was 2.9 times Ryan's trailing 12 month adjusted gross profit. A copy of each award is attached hereto as Exhibits B and C. The arbitration awards were confirmed by the United States District Court for the Southern District of New York.

12.    Molson USA attempted to negotiate with Finger Lakes for the voluntary sale of the Molson distribution rights, but such effort has been unsuccessful.

13.    As the assignee of Molson USA's rights under the Distributor Agreement, Coors continues to pursue the Consolidation Plan.

14.    The provision of the Act, as amended, that requires Coors to show a contemporaneous reduction in the number of Molson distributors in the states contiguous to New York offends the Dormant Commerce Clause of the United States Constitution, in that the Act impermissibly attempts to regulate the conduct of Molson and Coors beyond the boundaries of the state of New York.

15.    Coors is entitled to an award, as follows:

a.    Declaring that Coors has the right under all applicable law to terminate the Distributor Agreement and any and all other claimed right by which Finger Lakes distributes Molson products in its assigned New York territory.

2

b.     Declaring the amount of compensation due to Finger Lakes for the fair market value of the distribution rights and declaring that Finger Lakes has not suffered any other damages from such termination.

c.     For such other relief as may be proper and just.

3

# EXHIBIT C

# AMERICAN ARBITRATION ASSOCIATION
## Commercial Arbitration Tribunal

---

In the Matter of the Arbitration between

Re: 13 155 00714 08
    Coors Brewing Company
    and
    Finger Lakes Bottling Co., Inc.

---

## AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated January 08, 2003, and having been duly sworn, and having duly heard the proofs and allegations of the parties Coors Brewing Company ("Coors") and Finger Lakes Bottling Co., Inc. ("Finger Lakes"), do hereby, AWARD, as follows:

1. Coors, the Claimant in this arbitration, is a brewer and seller of beer products.

2. Finger Lakes, the Respondent in this arbitration, is a distributor of beverages including beer products.

3. In January 2003, Finger Lakes entered into a distributorship agreement (the "Agreement") with Molson USA LLC for the distribution of Molson products in a certain territory of upstate New York. In 2007, the Agreement was assigned by Molson USA to Coors.

4. The Agreement provides that all disputes between the parties, except for nonpayment of the distributor's account, "shall be submitted to binding arbitration…in accordance with the Commercial Arbitration Rules and procedures of the American Arbitration Association."

5. In 2001, Molson USA adopted a national plan of consolidation, the stated purpose of which was to have Molson products distributed by Coors distributors rather than by distributors who were unaligned with Coors (the independents). In 2005, Molson USA gave notice to the unaligned New York distributors that it intended to pursue its plan of consolidation in New York. Molson USA also gave notice of a "test' arbitration against an unaligned upstate New York distributor, John G. Ryan ("Ryan"). The arbitrator in the Ryan case determined that Molson USA was in compliance with Section 55-c of the New York Alcoholic Beverage Control Law (the "ABC Law") in terminating Ryan as a Molson distributor, and also determined that the fair market value of the terminated Molson distribution rights to which Ryan was entitled, was a multiple of 2.9 times Ryan's trailing 12 month adjusted gross profit. In determining fair market value, the arbitrator accepted the highest valuation of Coors' expert.

6. On March 21, 2008, Coors, as assignee of the Agreement, filed the within claim in arbitration requesting an award: a) declaring that Coors has the right under all applicable law to terminate the Agreement, b) declaring the amount of compensation due to Finger Lakes for the fair market value of the distribution rights, and c) declaring that Finger Lakes has not suffered any other damages from such termination.

1

7.  In addition, by letter dated March 21, 2008, Coors tendered to Finger Lakes a check in the amount of $908,893.87, representing (with some adjustments) payment for the "estimated fair market value of the distribution rights for the Molson Brands and other damages sustained due to the loss of the Brands pursuant to Section 55-c of the (ABC) Law....". Coors' calculation of the fair market value of the distribution rights was based upon the 2.9 multiple awarded in Ryan. The letter went on to state that with the tendering of the check, Finger Lakes' right to distribute the Molson Brands "is terminated as of today."

8.  Subsequent to a preliminary conference before the Arbitrator, wherein issues regarding the jurisdiction of the American Arbitration Association and justiciability were raised, Finger Lakes filed motions to dismiss Coors' first claim for declaratory relief and to join MillerCoors, LLC as a necessary party. Finger Lakes' motions were denied.

9.  Thereafter, by letter to the Arbitrator dated August 27, 2008, counsel for Finger Lakes informed the Arbitrator that the parties had agreed that the only issue to be tried in this arbitration would be "the damages to which Finger Lakes is entitled by reason of Coors' termination of their distribution rights, and by the further agreement that the compensatory damages payable would be measured by the fair market value of those distribution rights." The letter continued, "The effect of these agreements is that it will no longer be necessary to try the bona-fides of Coors' policy of consolidation." Finger Lakes did, however, assert that the foregoing agreement limiting the scope of the arbitration did not prevent it from seeking an award of exemplary damages as a result of Coors' bad faith termination, and applied for the right to seek same. Finger Lakes' application to seek exemplary damages in this proceeding as limited by the parties' agreement was denied.

10. Evidentiary hearings were held on December 15 and 16, 2008. Coors introduced documentary exhibits and the testimony of Jeri Rippon (fact witness) and Lamont Seckman (expert witness) ("Seckman"). Finger Lakes introduced documentary exhibits and the testimony of Sam Vasile (fact witness) and Jules Kamin (expert witness)("Kamin"). The documentary exhibits included the interim and final arbitration awards in Ryan as well as the award in an arbitration brought by Coors against another unaligned upstate New York distributor, Doldo Brothers, Inc. ("Doldo"). The exhibits also included the Seckman valuations in both Ryan and Doldo.

11. The parties did not come to an agreement as to the form of award (standard short form, reasoned, or findings of fact and conclusions of law). Therefore, in accordance with Rule 42(b) of the Commercial Arbitration Rules, the Arbitrator has determined that the form of the award will be reasoned.

12. The sole issue in this arbitration is a determination of the fair market value ("FMV") on March 21, 2008, of Finger Lakes' distribution rights which were lost on account of the termination. Section 55-c(2)(i) of New York's ABC Law defines the FMV of distribution rights as "the amount a willing seller, under no compulsion to sell, would be willing to accept and a willing buyer, under no compulsion to purchase, would be willing to pay for the distribution rights."

13. Using Seckman's projections in Ryan and Doldo, Kamin concluded that the FMV in this case is a negotiated range of a multiple between 7.6 and 10.5 times adjusted gross profit, offering four possibilities between $2,454,978 - $3,440,364. Seckman concluded that the FMV in this case is a multiple of approximately 1.5 times adjusted gross profit ($490,000).

14. Coors and Finger Lakes were highly critical of the methodology and underlying assumptions employed by the each other's expert. With respect to Kamin's opinion, Coors' criticisms included:

a. using a virtually risk free discount rate (average CD interest rate), thereby understating the risk to a potential buyer of the distribution rights,

b. failing to include certain variable costs, including labor costs, in his assumption, thereby overstating Finger Lakes' profitability,

c. failing to adequately address a long term trend of declining sales of Molson products in Finger Lakes' territory,

d. failing to perform an independent analysis of market conditions in the territory, relying instead on Seckman's Ryan and Doldo projections,

e. failing to use a hypothetical willing buyer and seller,

f. failing to do a reality check, and

g. failing a reality check

With respect to Seckman's opinion, Finger Lakes' criticisms included:

a. failing to value the strategic advantages of acquiring the Molson brand,

b. relying on after the fact information that would not have been available to a potential buyer prior to the termination date,

c. using the build-up, or weighted average cost of capital (WACC), method in circumstances where it is inappropriate (failing to recognize the duopolistic nature of the marketplace)

d. using data from public companies rather than from Coors' database,

e. assuming that a potential purchaser would want to pay off the cost of acquisition in a short period of time,

f. factoring in an additional risk of the Molson brand,

g. failing to account for the seasonal swell of population in Finger Lakes' territory,

h. ignoring the value of shelf and floor space being acquired by a potential buyer,

i. improperly deducting labor costs as a variable,

j. failing to do an EBITDA reality check, and

k. manipulating his own reality check

15. I am rejecting Kamin's valuation as the basis upon which to determine the FMV of the Molson distribution rights lost by Finger Lakes as a consequence of the termination. The primary reason for my doing so is that there was no reality check evidence supporting his conclusion that the FMV of Finger Lakes' Molson distribution rights was a range somewhere between 7.6 and 10.5 times adjusted gross profit. In fact, there was no evidence presented showing that a sale of distribution rights between a willing buyer and willing seller had EVER been consummated near Kamin's higher range. On the contrary, the reality check evidence showed sales at far lower

3

multiples. In this context, it is worth noting that Finger Lakes acquired the Molson distribution rights in the 1990's for $586,000, at an approximate multiple of not much more than 1. While it was argued by Finger Lakes that many of the sales were forced rather than willing, thereby depressing sales prices, it would be incorrect to state that there were no willing buyer/willing seller transactions. In fact, Vasile testified that one of the primary reasons for the purchase of distribution rights was so that a distributor could better position itself against the competition in an environment of rapid consolidation. However, even if one accepts that the recent increased pace of consolidation has created a premium for the strategic value of the distribution rights, there was no evidence presented establishing that such a premium would rise to a level anywhere near Kamin's range of multiples.

16. While Kamin's valuation can be rejected on this basis alone, I am also rejecting it because of his use of a virtually risk free (average CD) interest rate. In doing so, I reject Finger Lakes' argument that the purchase of the Molson distribution rights "is not a risky investment." This argument is contrary to evidence showing a decline in sales of Molson products, both in and outside of Finger Lakes' territory, coupled with an apparent disinterest by the brewer to focus assets on reinvigorating the Molson brand, and the potential that the brewer might abandon the brand altogether. Although Finger Lakes argues that because Sec. 55-c "provides tremendous protections to distributors, an acquiring distributor can be assured that at the very least it will be compensated for the fair market value of the brand" (Respondent's Post Hearing Brief, p 31), there is no protection if the fair market value itself falls.

17. I am also rejecting Seckman's valuation as the basis from which to determine the FMV of the distribution rights lost by Finger Lakes as a consequence of the termination. In doing so, I find several of the criticisms leveled against Seckman's factual assumptions to be valid, including his failure to account for the strategic advantage that acquiring the Molson brand might have in an environment of rapidly increasing consolidation. Both Coors' and Finger Lakes' fact witnesses testified regarding the pressure in the marketplace caused by the diminishing number of brands available for acquisition except through consolidation. And both fact witnesses agreed that in order to compete in this marketplace, distributors, particularly Coors and Miller distributors, had to grow in size. There is no doubt that in such an environment, a buyer would be willing to pay a premium to strategically position itself against the competition, and some consideration should have been given to this factor. In this regard, Seckman did not show, and I reject his assertion, that the premium is already "built in."

18. Additionally, I find that, in attempting to draw distinctions between Finger Lakes on the one hand, and Ryan and Doldo on the other, Seckman did not consider certain favorable factors in Finger Lakes' territory, for example, the temporary swell of population during the summer season, choosing instead to emphasize the demographic of an aging population which he characterized as "non beer drinking." In addition, Seckman's theoretical analysis of labor costs did not reflect the reality of Finger Lakes' very widespread territory that essentially required the same number of trucks and drivers to be sent on the road even without the Molson cases. Furthermore, there was no convincing evidence that a potential purchaser would want to pay off the Molson acquisition cost in two to three years. It was also not appropriate for Coors to reference data that was not available until after the termination, information that could not have been considered by potential buyers and sellers in negotiating a purchase price (later write-off and 2008 31 week figures).

19. In summary, I am of the opinion that both experts made factual assumptions and employed methodologies that ultimately favored the positions espoused by their respective clients, in the case of Kamin, exaggerating upward, and in the case of Seckman, exaggerating downward. I do not necessarily fault the experts in this regard, because I believe it is possible for two sides to look at the same scenario, yet see and interpret it differently. For example, one expert excluded sales with multipliers of four as "outliers" while the other party included them in its

4

analysis. Be that as it may, I am tasked with determining an appropriate valuation based on the totality of the evidence presented, including the oral testimony of the fact witnesses, and documentary evidence other than the rejected reports.

20. Based on the totality of the evidence, I find the proper valuation to be $1,060,224.00. This valuation is composed of two elements. The first element is a multiple of 2.9 times adjusted gross profit using $4.11 profit per case and 77,350 Molson case equivalents. The second element is a premium of 15%.

21. I have chosen 2.9 as the appropriate multiple for several reasons. The first is that, having rejected the very high and very low multiples put forth by the experts in this case, I am left with two choices. I can either substitute my independent judgment for that of the experts by inserting my own factors from various sources and creating my own multiple. Or, I can use a multiple previously put forth by the experts in similar cases by concluding that adequate distinctions between the valuations in the other cases and this case were not proven. Of the two alternatives, I choose the latter because, not being an expert, I believe that it is more appropriate to employ a multiple previously used by an expert in a similar matter than it is to fashion my own multiple. In my opinion, the proper multiple to be applied in this case is 2.9, the multiple used by Seckman in Ryan. I find that Seckman's use of a 1.5 multiple in this case, a drastic reduction from his valuation in Ryan some 14 months earlier, cannot be justified by a continuation of the long term downward trend in Molson sales. Rather, I find such reduction to be primarily the result of flaws in various underlying factual assumptions Seckman employed in this case. Furthermore, notwithstanding the attempted reservation of rights language in the termination letter to Finger Lakes, the evidence established that Coors demonstrated on various occasions its intent to be bound by that multiple. In addition, Coors would not have been in compliance with the statute, and could not have properly terminated Finger Lakes, if the amount tendered to Finger Lakes was less than the FMV. The amount Coors tendered was based on the 2.9 multiple.

22. With regard to the second element, the evidence established that a hypothetical buyer would be willing to pay a premium to strategically position itself for the new Miller/Coors joint venture and for other rapidly increasing consolidation in the marketplace. Not including such premium would result in undervaluing the real world distribution rights. I find the reasonable value of this premium in the case of Finger Lakes to be 15% of the 2.9 multiple, and have made an upward adjustment to account for this factor.

THEREFORE:

Based upon the totality of the evidence presented by the Parties, and in accordance with the requirements of Section 55-c(2)(i) of the New York Alcoholic Beverage Control Law, it is my determination that the fair market value a willing seller, under no compulsion to sell, would be willing to accept, and a willing buyer, under no compulsion to purchase, would be willing to pay for the Molson distribution rights held by Finger Lakes and terminated by Coors on March 21, 2008 is $1,060,224.00.

In accordance with Section 55-c(7)(c) of New York's ABC Law, the administrative fees and expenses of the American Arbitration Association, totaling $4,500.00, and the compensation of the Arbitrator, totaling $19,308.45, shall be borne equally. Therefore, Finger Lakes Bottling Co., Inc. shall reimburse Coors Brewing Company the sum of $2,250.00, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Coors Brewing Company.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

5

_February 28 2009_
Date

_Joanne Barak_
Joanne Barak

I, Joanne Barak, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_February 28 2009_
Date

_Joanne Barak_
Joanne Barak

# EXHIBIT D

AMERICAN ARBITRATION ASSOCIATION
**Commercial Arbitration Tribunal**

In the Matter of the Arbitration between:

Re: 13 155 00714 08

| Coors Brewing Company | (Claimant) |
|---|---|
| and | |
| Finger Lakes Bottling Co., Inc. | (Respondent) |

## DISPOSITION OF APPLICATION FOR CLARIFICATION OF AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated January 8, 2003, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, and having previously rendered an Award dated February 25, 2009, and Respondent having filed an application for clarification dated February 27, 2009, and Claimant having responded by letter dated March 13, 2009, do hereby, DECIDE, as follows:

Respondent's first contention is that there is a miscalculation in the determination of fair market value, and the Award must be modified in accordance with the calculation submitted by Respondent in its Request for Clarification. There is no miscalculation. The figures which Respondent wishes the Arbitrator to apply were based on 2007 sales. The Arbitrator determined that the figures provided in Claimant's termination letter, stated to be based on "52 week sales through Week 11, 2008", were more current, and more accurately reflected the continued downward trend in the sale of Molson products. Respondent's request to apply 2007 figures rather than the 12 month trailing figures is denied.

Respondent's second contention is that it is entitled to prejudgment interest as a matter of right, and the Award must be amended to reflect the inclusion of interest from March 21, 2008. The Award addressed the only issue remaining before the Arbitrator subsequent to the parties' August 27, 2008 pre-hearing agreement, that is, a determination of the fair market value of Respondent's Molson distribution rights as of March 21, 2008. In that the Award did not order the payment of any monies due and owing to Respondent from Claimant, whether Respondent is entitled to interest since March 21, 2008 was beyond the scope of the arbitration and was not considered. Respondent's request to amend the Award to include interest from March 21, 2008 is denied without prejudice to seek interest in any enforcement proceeding.

In all respects, the Award dated February 25, 2009, is reaffirmed and remains in full force and effect.

March 31, 2009
Date

Joanne Barak
Joanne Barak

I, Joanne Barak, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Disposition of Application for Clarification of the Award.

March 31, 2009
Date

Joanne Barak
Joanne Barak

# EXHIBIT E

# ETTELMAN & HOCHHEISER, P.C.
## ATTORNEYS AT LAW

GARDEN CITY CENTER
100 QUENTIN ROOSEVELT BOULEVARD
SUITE 401
GARDEN CITY, NY 11530-4850

TEL: (516) 227-6300
FAX: (516) 227-6307
WWW.E-HLAW.COM

April 17, 2008

**VIA OVERNIGHT MAIL**

Mr. Claude Wright
Wright Wisner Distributing Corp
3165 Brighton-Henrietta Town Line Road
Rochester, NY 14623

Re:  **Finger Lakes Bottling Co., Inc.**

Dear Mr. Wright:

We are in receipt of your letter of April 10, 2009 and the check enclosed therewith. Finger Lakes is not in a position to accept your purported settlement check tendered on behalf of Coors Brewing Company at the present time **unless** Coors Brewing Company stipulates that by depositing the check, Finger Lakes will not have waived its right to seek either pre and post-judgment interest or to recover the amount due to Finger Lakes by reason of the Arbitrators error in computation resulting from the Arbitrator's use of incorrect volume figures. Although the Arbitrator has calculated a final award amount, Finger Lakes intends to seek an order of the United States District Court correcting and confirming the award together with interest at the statutory rate of 9 percent per annum. If Coors Brewing Company agrees to our proposal, interest will stop accruing on the amount of your check. If it is rejected, interest will continue to accrue on the entire amount. Of course, if Coors agrees to our proposal, it will be without prejudice to their right to oppose any of the relief we may seek.

If I do not hear from you or Coors within 7 days, I will take your silence as a rejection and will proceed accordingly.

Very truly yours,

Gary Ettelman

cc:   Michael Lockerby, Esq.
      Sam Vasile

From:    Origin ID: ELZA   (516) 227-6300
Jeanne Corradi
ETTELMAN & HOCHHEISER, P.C
100 QUENTIN ROOSEVELT BLVD
SUITE 401
GARDEN CITY, NY 11530



Ship Date: 17APR09
ActWgt: 1.0 LB
CAD: 5487993/INET9011
Account#: S *********

SHIP TO:    (516) 227-6300          BILL SENDER
**Mr. Claude Wright**
**Wright Wisner Distributing Corp.**
**3165 BRIGHTON HENRIETTA TI RD**

## ROCHESTER, NY 14623

Delivery Address Bar Code



Ref #      Finger Lakes - GE
Invoice #
PO #
Dept #



TRK#
0201    7975 1686 3262

**MON - 20APR          A1**
**STANDARD OVERNIGHT**

14623
NY-US
ROC

# SF ONHA



**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic valueof the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.